UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARAINA SKY JONES,

             Plaintiff,              CIVIL ACTION NO. 11-14176

        v.                  MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     PROCEDURAL HISTORY**

    ***A.    Proceedings in this Court***

On September 22, 2011, Plaintiff filed suit seeking judicial review of the Commissioner's decision to deny benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), the case was referred to this Magistrate Judge (Dkt. No. 3). Cross-motions for summary judgment are pending (Dkt. Nos. 9, 10).

The parties consented to this Magistrate Judge's jurisdiction (Dkt. No 11) and, on April 13, 2012, Judge Stephen J. Murphy, III authorized this Magistrate Judge to decide the pending motions and enter final judgment (Dkt. No. 12).

**B.      Administrative Proceedings**

Plaintiff filed claims for disabled adult child disability benefits[1] and supplemental security income on May 19, 2008, alleging disability beginning on March 25, 2006 (Tr. 10, 77-81).  The claim was initially denied by the Commissioner on September 4, 2008 (Tr. 10, 82-89). Plaintiff requested a hearing and, on April 19, 2010, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the case *de novo*.  In a decision dated September 2, 2010, the ALJ found that Plaintiff was not disabled (Tr. 7-23). Plaintiff requested a review of this decision on September 30, 2010 (Tr. 125-138).  On August 26, 2011, the ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[2] (AC-13B, Tr. 125-138), the Appeals Council denied Plaintiff's request for further review (Tr. 1-6).

For the following reasons, the Court finds that the ALJ's decision is supported by substantial evidence in the record.  Accordingly, Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED** and the findings and conclusions of the Commissioner are **AFFIRMED**.

---

[1]  Disabled adult child disability benefits are available "if such child was under a disability...at the time [s]he attained the age of 18 or if [s]he was not under such a disability...at such time but was under a disability...at or prior to the time [s]he attained...the age of 22." 42 U.S.C. § 402(d)(1)(G); *see also* 20 C.F.R. § 404.350(a)(5).  More specifically, "[a]n adult disabled before age 22 may be eligible for child's benefits if a parent is deceased or starts receiving retirement or disability benefits. [The SSA] consider[s] this a 'child's' benefit because it is paid on a parent's Social Security earnings record.  The 'adult child' – including an adopted child, or, in some cases, a stepchild, grandchild, or step grandchild – must be unmarried, age 18 or older, and have a disability that started before age 22." *See* http://www.ssa.gov/dibplan/dqualify10.htm#a0=1&age22= (last visited Sept. 12, 2012).

[2]  In this circuit, where the Appeals Council ("AC") considers additional evidence but denies a request to review the ALJ's decision, those AC exhibits are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

## II.  STATEMENT OF FACTS

### A.  ALJ Findings

Plaintiff was 19-years-old on her alleged disability onset date (Tr. 18).  Plaintiff does not

have any past relevant work experience (Tr. 18).  The ALJ applied the five-step disability

analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful

activity since March 25, 2006, her alleged disability onset date (Tr. 12).  At step two, the ALJ

found that Plaintiff had the following "severe" impairments: "pelvic pain, closed head injury,

anxiety, depression, impulse control disorder, migraine headaches and mood disorder."  *Id*.  At

step three, the ALJ found no evidence that Plaintiff's impairment or combination of impairments

met or medically equaled one of the listings in the regulations (Tr. 13).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional

Capacity (RFC) to perform

> [T]he full range of light work...except that she is limited to occasional climbing of
> stairs, crouching, stooping or bending; should avoid climbing of ladders or
> crawling; should further avoid hazardous machinery, unprotected heights, power
> tools or things that vibrate; and should have the opportunity to alternate between
> sitting and standing while engaged in the work.  Additionally, [Plaintiff] is able to
> perform work that is simple and routine (e.g., one to two step tasks) and in which
> she controls the pace of the work, which involves no more than occasional contact
> with co-workers and the general public and where she is not closely supervised.
> (Tr. 14).

At step four, the ALJ found that Plaintiff had no past relevant work (Tr. 19).  At step five, the

ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant

number of jobs available in the national economy, such as visual inspector/sorter, hand assembler

or hand packager (20,000 positions in the state of Michigan, 10,000 of which are in the Detroit

Metro area) (Tr. 18).

### B.    Administrative Record

#### 1.    Plaintiff's Testimony and Statements

Plaintiff has not worked since being injured in a March 2006 car accident (Tr. 32, 38). She suffered a closed head injury and said the accident changed her personality (Tr. 38). Specifically, Plaintiff testified that she is "mean to a lot of people for no reason" and gets tired easily (Tr. 38).  Plaintiff also testified that she has pain in her right hip, forgets things and has "migraines all the time"(Tr. 39).  As far as daily living activities, Plaintiff testified that she takes care of her personal hygiene (Tr. 35) and kindergarten-age son, prepares frozen food, does laundry (Tr. 35), uses Facebook, does crossword puzzles (Tr. 37) and watches movies (Tr. 39-40).

Plaintiff's mother, Kathy Barber, indicated on a function report that Plaintiff successfully completes word search puzzles and plays bingo well (Tr. 163). Ms. Barber also reported that Plaintiff lives with her young son (Tr. 159), whom Plaintiff feeds and bathes, and that Plaintiff has no difficulty providing her own personal care (Tr. 160); however, she sometimes needs reminders to brush her hair or change her clothes.  In addition, Ms. Barber reported that Plaintiff: prepares frozen meals, but cannot concentrate sufficiently to cook on a stove; performs household chores, but may need breaks (Tr. 161); shops in stores for food and clothing once a week for 2 hours (Tr. 162);"flies off the handle very easy [sic];" has balance problems; cannot complete tasks; can only concentrate for 1 hour (Tr. 164); does not handle stress well; and is upset by changes in routine (Tr. 165).

2.      **Medical Evidence**

*i) Physical Impairments*

Plaintiff was involved in an automobile accident on March 25, 2006.  She sustained serious injuries, including: a ruptured aorta, collapsed lung, liver laceration, multiple rib and pelvic fractures, and traumatic brain injury; she was in a coma for over a month following the accident (Tr. 213, 234, 357).  Plaintiff sustained bilateral subarachnoid hemorrhages and a CT head scan revealed bifrontal and temporal cortical contusions with axonal shear injury involving the corpus callosum (Tr. 213). Plaintiff's injuries to her thoracic aorta and right subclavian artery led to bilateral vocal cord paralysis (Tr. 271).  Louis Sobol, M.D., performed a tracheostomy on March 31, 2006 (Tr. 213). Plaintiff was transferred to a rehabilitation unit on April 28, 2006 for physical therapy, occupational therapy, and speech/language therapy (Tr. 213). On May 8, 2006, an electroencephalogram (EEG) showed a moderate degree of head injury (Tr. 235).

Plaintiff was discharged from the hospital on May 24, 2006, with diagnoses including: cerebral contusion without mentation with secondary diagnosis of traumatic pneumothorax, bilateral complete paralysis of vocal cords, and thoracic aorta injury (Tr. 241). Plaintiff received home orders for physical therapy, occupational therapy, speech therapy, and home nursing care; she had a PEG tube for tube feedings and a trach collar (Tr. 242).

In July 2006, Plaintiff reported good swallowing and a normal voice, and Dr. Sobol opined that Plaintiff's vocal cord mobility should return (Tr. 271). On December 6, 2006, Michael Benninger, M.D., an otolaryngology specialist, reported that Plaintiff was doing very well, she was very comfortable with the quality of her voice and breathing, and her tracheostomy site was completely healed (Tr. 318).

-5-

Also in July 2006, Maciej Uzieblo, M.D., a vascular surgeon, examined Plaintiff for follow-up of the endovascular repair of her thoracic aortic disruption and stenting of her proximal left subclavian artery (Tr. 365). Plaintiff was doing well regarding the repair, and her manipulation was improving with physical therapy (Tr. 365). Plaintiff had no complaints, specifically denying lateralizing and neurological symptoms and left upper extremity complaints (Tr. 365). A duplex ultrasound revealed a mild pressure gradient between Plaintiff's arms (Tr. 365, 367).

A January 2007 CT angiogram showed stable left subclavian and thoracic stent and improving hepatic lacerations; Plaintiff had good perfusion and well-maintained flows in both upper extremities (Tr. 224, 362). One month later, Dr. Uzieblo examined Plaintiff and reported that her aortic repair was doing well, she had no complaints, and she could use her upper extremities without difficulty (Tr. 363). A repeat duplex ultrasound again revealed mild pressure (Tr. 363). Dr. Uzieblo opined that Plaintiff's aortic disruption was resolved and that Plaintiff only needed CT scans for the next 5 years (Tr. 363).  Dr. Uzieblo recommended following Plaintiff's subclavian artery conservatively with a repeat ultrasound in 6 months, given waveform disturbance and a pressure gradient that was present on examination (Tr. 363).

In August 2007, Plaintiff reported dull, non-radiating hip pain without numbness or tenderness, exacerbated by activity (Tr. 238). Examination by an orthopedic specialist, Patrick Joseph Wiater, M.D., revealed "healed" fractures and full motor strength (Tr. 238). Plaintiff's pain was significantly improved compared to the initial injury (Tr. 238).  Plaintiff presented to a neurology clinic on August 7, 2007, complaining of headaches and blurred vision (Tr. 239). A brain MRI taken in August 2007 was normal; Plaintiff's subarachnoid hemorrhage was resolved (Tr. 240).  Plaintiff reported that ibuprofen resolved her migraines (Tr. 240).

In November 2007, Plaintiff saw Michael Barnes, M.D., of Beaumont Hospital, a primary care physician.  Plaintiff reported taking Motrin, which was not providing her with as much relief as previously, but otherwise doing very well "overall" (Tr. 222).  Plaintiff's mother reported that Plaintiff has slowly improved since the car accident, although Plaintiff was still not 100% and had "trouble remembering things" (Tr. 222).

Bret Bielawski, D.O., an internal medicine specialist, examined Plaintiff on August 20, 2008, and reported that she had a mild degree of dysarthria[3], pelvic dysfunction, mild difficulty doing orthopedic maneuvers, normal range of hip motion, unimpaired hand dexterity, a positive standing flexion test, and walked with a mild left-sided limp without the use of an assistive device (Tr. 417).  Plaintiff also exhibited normal motor strength, intact sensation, intact reflexes, a negative Romberg test, was cooperative with questions, followed commands, exhibited normal concentration, and had intact memory (Tr. 416-17).

In October 2009, Plaintiff returned to Beaumont Hospital complaining of migraines 2-3 times monthly; Plaintiff also complained of photophobia and blurry vision (Tr. 450). She requested a referral to a neurologist, noting that Motrin provided no relief (Tr. 450). She was taking Imitrex for migraines (Tr. 455), and complained of a "personality change after [the] car accident" (Tr. 453).

### ii) Mental Impairments

During her hospitalization in May 2006, Hiten Patel, M.D., evaluated Plaintiff and

---

[3]  "Dysarthria is a condition in which you have difficulty controlling or coordinating the muscles you use when you speak, or weakness of those muscles. Dysarthria often is characterized by slurred or slow speech that can be difficult to understand."  *See* http://www.mayoclinic.com/health/dysarthria/DS01175 (last visited Sept. 21, 2012).

diagnosed adjustment disorder and depression (Tr. 226). Plaintiff had a somewhat depressed

mood, intact memory, fair judgment, and a slightly blunted affect with mild psychomotor

retardation (Tr. 225). Dr. Patel concluded that Plaintiff was "clinically competent" at that time

(Tr. 226).

On March 3, 2007, Pamela Herringshaw, Ph.D., evaluated Plaintiff, who reported

2-3 headaches weekly (Tr. 372). Plaintiff also reported difficulty closing her right hand into a

fist and with writing (Tr. 373). Plaintiff's sister reported that Plaintiff's intellectual functioning

changed after her car accident (Tr. 373). Dr. Herringshaw diagnosed "Personality Change due to

Closed Head Injury (by report of Plaintiff's sister)," and adjustment disorder with depressed

mood (Tr. 378). Plaintiff's only medication at that time was Motrin (Tr. 373). Dr. Herringshaw

reported that Plaintiff had problems retrieving and processing information (Tr. 378), specifically

that Plaintiff's stream of mental activity was "blocked" during much of the examination, and that

it took Plaintiff "a long time to retrieve information and put it into words when answering

questions" (Tr. 376). Dr. Herringshaw gave Plaintiff a Global Assessment of Functioning

("GAF") score of 60 (Tr. 378).[4] Dr. Herringshaw gave Plaintiff a "favorable" prognosis "with

---

[4] The GAF score is "a subjective determination that represents the clinician's judgment
of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1
(persistent danger of severely hurting self or others, persistent inability to maintain minimal
personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40
indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical,
obscure, or irrelevant) or major impairment in several areas such as work or school, family
relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious
symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no
friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate
difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272,
276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw
medical data. Rather, it allows a mental health professional to turn medical signs and symptoms
into a general assessment, understandable by a lay person, of an individual's mental functioning."
*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

continued medical treatment which would include Occupational Therapy and Physical Therapy (Tr. 378).

Dr. Herringshaw conducted a second psychological evaluation in August of 2008 (Tr. 406-413). During this examination, Plaintiff reported memory loss, anxiety attacks, migraine headaches and blurred vision. Plaintiff reported that her migraines "can last up to three days a week" and that the pain with those headaches with 9 on a scale of 1 to 10 (Tr. 407). Plaintiff stated that she "gets angry every day" and that she "feels she has had a major personality change" since the auto accident (Tr. 407). At the time of this exam, Plaintiff was taking ibuprofen (800mg, three times per day) and Propranolol (80mg, once per day – for migraines) (Tr. 407). Dr. Herringshaw again reported that Plaintiff's "[s]tream of mental activity was often blocked and retrieval of information was often delayed" (Tr. 410). Dr. Herringshaw again diagnosed "personality change due to a closed head injury" and adjustment disorder with depressed mood, but also included a new diagnosis of "panic disorder without agoraphobia" (Tr. 412). Dr. Herringshaw concluded that Plaintiff's "mental functioning is moderately impaired" but that Plaintiff's "physical abilities seemed to be the main issue with her inability to work or engage in other activities" (Tr. 413).

Also in March 2007, Blaine Pinaire, Ph.D., a state agency psychological expert, reviewed Plaintiff's file and concluded that her adjustment disorder with depressed mood and organic mental disorder (evidenced by personality change and mood disturbance) (Tr. 393, 395) caused "moderate" limitations related to daily activities; social functioning; and concentration, persistence, or pace (Tr. 402, 404). Despite these moderate limitations, Dr. Pinaire ultimately concluded that Plaintiff was "capable of unskilled work" (Tr. 390).

In August 2008, Rom Kriauciunas, Ph.D., another state agency psychological expert, opined that Plaintiff had a "mild" restriction of her daily activities and "moderate" difficulties in maintaining both social functioning and concentration, persistence, or pace, and she had experienced 1-2 episodes of decompensation (Tr. 424, 426, 428, 433). Dr. Kriauciunas assessed moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and respond appropriately to changes at work, but ultimately concluded that Plaintiff could "do simple, low-stress, unskilled work on a sustained basis" (Tr. 421).

Rao Vallabhaneni, M.D., a psychiatrist, evaluated Plaintiff in December 2009 and January 2010 (Tr. 445). Plaintiff complained of depression, anxiety, and impulsive behavior (Tr. 445). Dr. Vallabhaneni noted that Plaintiff had no seizures, psychosis, or threatening/violent behavior (Tr. 445). Plaintiff had a blunt affect, but her other mental status examination findings were normal, including attitude, psychomotor activity, attention/concentration, and impulse control (Tr. 445). Plaintiff was given a GAF score of 45 (Tr. 447). Dr. Vallabhaneni prescribed Celexa (an anti-depressant) and within one month, Plaintiff's mood improved, she had a new boyfriend and was "feelin [sic] happy lately as per mother" (Tr. 447-48). Plaintiff did not report any adverse side-effects from her medication (Tr. 448).

### 3. Vocational Expert

At the administrative hearing, the ALJ posed hypothetical questions to a Vocational Expert ("VE"). Specifically, the ALJ asked the VE whether work existed for an individual of Plaintiff's age, education, work experience, and RFC (Tr. 56-59). The VE stated that such a person could do sorting, inspecting, hand packaging, and some hand assembly jobs (Tr. 63). The VE further testified that – if Plaintiff and her mother's testimony was fully credited – then

-10-

Plaintiff would be precluded from work (Tr. 61). Specifically, the VE testified that Plaintiff's claimed fatigue, inability to stay on task, "cognitive issues," volatile personality and migraine headaches would preclude her from working (Tr. 61-62).

### C.    Plaintiff's Claims of Error

Plaintiff's overarching argument on appeal is that the Commissioner's decision is not supported by substantial evidence. Within this broad argument, Plaintiff argues that: (1) the ALJ's RFC did not adequately account for Plaintiff's "moderate" restriction in concentration, persistence and pace; and (2) the ALJ erred in assessing Plaintiff's credibility.

## III.   DISCUSSION

### A.    Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

-11-

591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In

deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de

novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499

F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of

course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including

that of the claimant."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a

claimant's subjective complaints and may...consider the credibility of a claimant when making a

determination of disability"); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)

(the "ALJ's credibility determinations about the claimant are to be given great weight,

particularly since the ALJ is charged with observing the claimant's demeanor and credibility")

(quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree

is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,

and other evidence.").  "However, the ALJ is not free to make credibility determinations based

solely upon an 'intangible or intuitive notion about an individual's credibility.'"  *Rogers*, 486

F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.

42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely

because it disagrees or because "there exists in the record substantial evidence to support a

different conclusion."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more

than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241;

*Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

**B.    Governing Law**

The "[c]laimant bears the burden of proving her entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et*

*seq.*).  Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  *See* F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

-14-

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [her] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    *Analysis*

#### 1. The ALJ's RFC Determination Is Supported By Substantial Evidence

Plaintiff first argues that the ALJ's hypothetical (and ultimate RFC) was inaccurate because it failed to explicitly recognize that Plaintiff was "moderately" limited in concentration, persistence and pace, social functioning (Dkt. 16 at 10-13). Specifically, Plaintiff claims that the ALJ's limitation of "simple and routine (e.g., one to two step tasks) [work]...in which [Plaintiff] controls the pace of work, which involves no more than occasional contact with co-workers and the general public and where she is not closely supervised" (Tr. 14) did not adequately account for Plaintiff's moderate difficulties in maintaining concentration, persistence and pace (Dkt. 16 at 5).

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work,

the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Plaintiff's argument  – that hypothetical limitations such as "simple," and "unskilled" fail to account for moderate mental deficiencies – is not uncommon and the case law in this District resolves it both ways. Indeed, there is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks.[5]  However, there is also authority that has found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.[6]  In analyzing this case law, the Court agrees that a

---

[5]  *See e.g., Benton v. Comm'r of Soc. Sec.*, 511 F.Supp.2d 842, 849 (E.D. Mich. 2007) ("Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations."); *Green v. Comm'r of Soc. Sec.*, No. 08–11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("In the present case, while finding that Plaintiff is 'moderately limited with concentration, persistence, and pace,' [the ALJ's] only limitations were with co-workers and the public, and to "unskilled, light jobs." These parameters are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE. Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at an unskilled job." (internal citations omitted)); *Long v. Comm'r of Soc. Sec.*, No. 09–14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) ("In the present case, the ALJ gave Plaintiff the mental limitation for 'simple unskilled work.' However, the ALJ also determined that 'with regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties.' The ALJ did not incorporate [that] limitation ... into the controlling hypothetical. This was error." (internal citations omitted)); *Perkins v. Comm'r of Soc. Sec.*, No. 10–10089, 2010 WL 5634379, at *9 (E.D. Mich. Dec. 14, 2010) (same).

[6]  *See e.g., Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7–8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations ... are not incompatible ."); *Latare v. Comm'r of Soc. Sec.*, No. 08–13022, 2009 WL 1044836, at *3 (E.D. Mich. April 20, 2009) ("The Law Judge's hypothetical questions to the Vocational Expert accurately described Plaintiff's moderate limitations caused by her depressive

-16-

hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task does not always equate with the difficulty of staying on task.  *See e.g., Green v. Comm'r of Soc. Sec.*, No. 08–11398, 2009 WL 2365557, at * 10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems ... need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence.  Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient"); *Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job").

However, there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC.  *See Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical

_____

disorder. There is no merit to Plaintiff's argument that the ALJ should have included a limitation that she had moderate limitations in maintaining concentration, persistence or pace. Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

-17-

question to adequately account for his own moderate limitations in concentration, persistence, or pace"). In a similar case, this evaluative process was explained as follows:

> Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible.

*Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

In *Hess*, the state agency doctor found that the claimant suffered moderate limitations in concentration, persistence, and pace, such that the claimant had limitations in performing at a consistent pace. *See Hess*, 2008 WL 2478325, at *7. However, the doctor ultimately concluded that the claimant retained the ability to perform unskilled tasks on a sustained basis. *Id.* at *4. The court in *Hess* concluded that because the ALJ relied on the state doctor's finding of a moderate impairment with concentration, persistence or pace, it was reasonable for the ALJ to also rely on that doctor's ultimate conclusion that the claimant could perform unskilled work on a sustained basis, and, accordingly, to omit a concentration-based limitation from the hypothetical. *Id.* at *8.

In this case, the ALJ's limitation of simple, routine work accurately reflects Drs. Pinaire and Kriauciunas' opinions that Plaintiff was "moderately" limited with respect to concentration, persistence and pace. On the same forms in which they indicated that Plaintiff had moderate limitations, Drs. Pinaire and Kriauciunas concluded, respectively, that Plaintiff was "capable of unskilled work" and could "do simple, low-stress, unskilled work on a sustained basis" (Tr. 390, 421). These conclusions are not significantly different from the RFC found by the ALJ, which

-18-

limited Plaintiff to "simple and routine (e.g., one to two step tasks) [work]...in which [Plaintiff] controls the pace of work..." (Tr. 14).  As in *Hess* and *Lewicki*, this Court believes that the ALJ's finding of a moderate limitation in concentration, persistence, or pace has to be considered in conjunction with Drs. Pinaire and Kriauciunas' broader conclusions, which suggest that Plaintiff could successfully perform unskilled occupational tasks.  As such, the hypothetical question (and then the RFC) used by the ALJ is supported by substantial evidence in the record and should not be disturbed on appeal.

### 2.  The ALJ Did Not Err In Assessing Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in assessing Plaintiff's credibility.  This Court does not make its own credibility determinations.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Lawson v. Comm'r of Soc. Sec.*, 192 Fed. App'x. 521, 528 (6th Cir. 2006).  The Court cannot substitute its own credibility determination for the ALJ's.  The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed ...." *Kuhn v. Comm'r of Soc. Sec.*, 124 Fed. App'x. 943, 945 (6th Cir. 2005).  The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard.  "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x. 485, 488 (6th Cir. 2005).  "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).  When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses.  *See*

*Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, 178 F.3d 1295 (6th Cir. 1999).

Plaintiff argues that the ALJ's credibility finding is flawed because the ALJ cited Plaintiff's work history, showing sporadic employment prior to the accident, as well as Plaintiff's ability to play bingo on a regular basis (Tr. 13, 17-18) (Dkt. 16. at 20-21).  However, the ALJ was entitled to consider these activities in assessing Plaintiff's credibility. *See* SSR 96-7p (listing factors that an ALJ "must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements," which includes "[t]he individual's daily activities"); 20 C.F.R. § 404.1529(c)(2).  The ALJ's credibility findings were also supported by the bulk of the medical evidence, and the opinions of the state agency medical experts who both examined and reviewed Plaintiff's file and concluded that she could perform work consistent with the RFC, and Plaintiff's daily functioning (Tr. 17).  Plaintiff's ability to care for her son, prepare frozen meals, perform household chores, shop outside the home on a weekly basis, complete word search puzzles very well, and regularly play bingo, undermined Plaintiff's claim that she had debilitating limitations that rendered   her disabled from all work.  *See* 20 C.F.R. § 404.1529(c)(3)(i).

Moreover, the ALJ properly relied on the opinions of Plaintiff's treating physicians and the examining physicians who – with the exception of Dr. Herringshaw – indicated that Plaintiff did not have limitations materially greater than those provided in the RFC (Tr. 18).  The ALJ also properly explained (Tr. 16) that she accorded little weight to Dr. Herringshaw's opinion that physical impairments rendered Plaintiff disabled since Dr. Herringshaw was a psychologist, conducting a mental status examination.  *See* 20 C.F.R. §§ 404.1527(d)(3), (4) (providing that

-20-

"[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion," and "[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The ALJ provided a detailed and lengthy discussion of her reasons for finding that Plaintiff's subjective complaints were not fully credible, and the Court finds that the ALJ's credibility determination is supported by substantial evidence. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Infantado v. Astrue*, 263 Fed. App'x 469, 475-76 (6th Cir. 2008).

## III.   CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED** and the findings and conclusions of the Commissioner are **AFFIRMED**.

**SO ORDERED**.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  September 24, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 24, 2012, by electronic and/or ordinary mail.*

*s/Melody Miles*
*Case Manager*